**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYAN SPAULDING, Derivatively on Behalf of GLOBAL BROKERAGE, INC. f/k/a FXCM INC., | Case No. |
| Plaintiff, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| v. | |
| KENNETH GROSSMAN, DAVID SAKHAI, EDUARD YUSUPOV, ARTHUR GRUEN, DROR NIV, WILLIAM AHDOUT, JANELLE G. LESTER, ROBERT LANDE, JAMES G. BROWN, ERIC LEGOFF, ROBIN E. DAVIS, and RYAN SILVERMAN, | |
| Defendants, | |
| -and- | |
| GLOBAL BROKERAGE, INC. f/k/a FXCM INC., a Delaware corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for

Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the

following on information and belief, except as to the allegations specifically pertaining to plaintiff

which are based on personal knowledge. This complaint is also based on the investigation of

plaintiff's counsel, which included, among other things, a review of public filings with the U.S.

Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and

other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought by plaintiff on behalf of nominal

defendant Global Brokerage, Inc. f/k/a FXCM Inc. ("FXCM" or the "Company") against certain of

its officers and directors for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law. These wrongs resulted in hundreds of millions of dollars in damages to FXCM's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2. FXCM offers online trading platforms of foreign exchange ("forex" or "FX")[1] and related services, and is registered with the Commodity Futures Trading Commission (the "CFTC") as a Futures Commission Merchant ("FCM")[2] and Retail Foreign Exchange Dealer ("RFED").[3] Through its trading platforms, the Company offers customers access to over-the-counter ("OTC") forex markets, which allows customers to buy and sell currencies.

3. The Company's currency trading platform purportedly employed what FXCM describes as an "agency" model, or "No Dealing Desk" model. An agency or No Dealing Desk broker operates as a middleman between traders to give their clients variable spreads and to match traders with other traders who would like to take the other side of a trade. In an agency/No Dealing Desk environment, the client has the benefit of dealing with numerous liquidity providers in order to get the most competitive bid and ask price, and an investor using this method has access to instantly

---

[1] Forex is the market in which currencies are traded. The FX market is the largest, most liquid market in the world, and includes all of the currencies in the world.

[2] An FCM is an individual or organization that solicits and/or accepts orders to buy or sell futures contracts, options on futures contracts, retail foreign exchange contracts, or swaps, and accepts money or other assets from customers to support such orders. An FCM also has the responsibility of collecting margins from customers.

[3] An RFED is an individual or organization that acts as a counterparty to an over-the-counter foreign currency transaction where buying and selling of financial instruments does not involve any of the exchanges. RFEDs complete futures contracts, options on futures contracts, or options contracts with people who are not eligible contract participants.

executable rates. Rather than profiting from customer losses, agency brokers earn money through set trading fees and commissions. Given FXCM's purported No Dealing Desk model, the Individual Defendants (as defined herein) repeatedly and unequivocally touted for years that customer transactions would be free from conflicts of interest because FXCM would not be on the other side of the trade or have any financial interest in the trade. Further, according to the Company's Forms 10-K, this No Dealing Desk model "has the effect of automatically hedging [FXCM's] positions and eliminating market risk exposure." As detailed herein, these representations were woefully inaccurate. In fact, FXCM did not operate a No Dealing Desk model and its business model was in fact highly conflicted, significantly risky, and outright illegal.

4.      FXCM long-maintained a policy of extending substantial leverage to its customers, with leverage extensions of as much as 50:1 for customers in the United States and 200:1 for international customers. When customers' positions took a loss as a result of their trading activity, FXCM's advertised policy stated that the Company would retain the investment that the customers had paid, but would not seek reimbursement for any negative customer balances. For years, this policy (and the commensurate risks) was explained by the Individual Defendants in the Company's annual filings with the SEC as follows:

> [FXCM's] technology platform includes a real time margin-watcher feature to ensure that open positions are automatically closed out if a customer becomes at risk of going into a negative balance on his or her account. Any disruption or corruption of this feature would subject us to the risk that amounts owed to us by such customer exceed the collateral in such customer's account, and *our policy is generally not to pursue claims for negative equity against our customers*.

5.      While this policy was effective at attracting customers and driving increased trade commissions for FXCM, as the Individual Defendants were long aware, the Company's business model was illegal on its face. Indeed, since at least 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") reforms, 17 C.F.R. §5.16 ("Regulation 5.16") has

expressly prohibited FX traders from representing that they will limit clients' trading losses, a fact

explicitly recognized in each of the Company's Forms 10-K in every year since Regulation 5.16 was

passed. Further, in stark contrast to the Individual Defendants' repeated representations that FXCM's

business model "eliminate[ed] market risk exposure," the Company's stated policy of not pursuing

customers for negative balances significantly increased FXCM's market risks. In fact, this illegal

policy ultimately caused the Company to incur *hundreds of millions of dollars in losses* associated

with a "Flash Crash" in the value of the euro (or "EUR") relative to the Swiss franc (or "CHF").

Specifically, on January 15, 2015, Switzerland (through the Swiss National Bank or "SNB")

unexpectedly decoupled the euro from the Swiss franc, causing the Swiss franc to appreciate 18%

compared to the euro over the course of the day (the "SNB Event"). As a result, FXCM's highly-

leveraged customers with positions in the EUR/CHF pair suffered immediate and significant losses,

which generated approximately $276 million in negative customer balances. Given FXCM's illegal

policy of not collecting on negative balances, the Company was thus on the hook for these

tremendous collective losses by its customers.

6.      The SNB Event also caused FXCM to immediately breach certain regulatory capital

requirements, leading regulators to threaten suspension of the Company's operations. As a result, the

Individual Defendants were forced to seek emergency funding which they secured by way of a $300

million loan from Leucadia National Corporation ("Leucadia"), with an interest rate of 10%,

increasing 1.5% per quarter with a staggering cap of 20.5% (the "Leucadia Loan"). The Leucadia

Loan also included an agreement that once the loan and associated fees were paid off, Leucadia

would be entitled to 50% of the next $350 million of FXCM's sale proceeds, dividends, or

distributions, 90% of the "[n]ext amount equal to 2 times the balance outstanding on the term loan

and fees as of April 16, 2015, such amount not to be less than $500 million or more than $680

million," and 60% of "[a]ll aggregate amounts thereafter." To make matters worse, the Leucadia Loan contained several restrictive covenants limiting FXCM's ability to enter mergers and other significant transactions, yet provided Leucadia with the right to force a sale of the Company after three years.

7.     On the above news, FXCM's stock price plummeted nearly *90%* from $14.87 per share on January 14, 2015, the day before the SNB Event, to just $1.60 per share on January 20, 2015, when the market had fully digested the revelations, wiping out over *$625.8 million* in market capitalization in a few days.

8.     On January 30, 2015, less than two weeks after the Company lost nearly all its value, FXCM's Board of Directors (the "Board") seized the opportunity to entrench themselves by adopting a self-serving Stockholder Rights Plan (the "Rights Plan"). As detailed *supra*, the Rights Plan was designed to wrongfully entrench the Company's officers and directors by creating a 10% ownership trigger (later reduced to just 4.9%) in order to deter any third party interest in the Company.

9.     On August 18, 2016, the CFTC filed a complaint against FXCM alleging that the Company's advertised policy "that it would zero balance customers with debit balances" violated Regulation 5.16, and thereafter, the Company consented to a permanent injunction prohibiting further violations. Worse still, on February 6, 2017, the CFTC and the National Futures Association ("NFA")[4] announced in a press release and accompanying order that the CFTC had settled additional various charges against FXCM and its two founders, defendants Dror Niv ("Niv") and William Ahdout ("Ahdout"). These announcements revealed for the first time that, contrary to the Individual Defendants' repeated representations that operated an agency model and its transactions were free

---

[4] The NFA is a self-regulatory association organized under the authority of the Commodity Exchange Act, 7 U.S.C. §21, and is overseen by the CFTC.

from conflicts of interest, from 2010 through at least 2014, FXCM was entwined in an undisclosed financial relationship with a market maker that consistently "won" the largest share of FXCM's purported No Dealing Desk trading volume, Effex Capital, LLC ("Effex") (also doing business as HFT Co.). According to the CFTC, Effex "was an FXCM-backed startup firm that was founded [in or about 2010] by a former FXCM executive while he was working at FXCM, that operated for the first year of its existence out of FXCM's office, and that shared most of its trading profits with FXCM." In fact, as disclosed by the CFTC, FXCM maintained a 70% interest in all profits of Effex through publicly undisclosed contractual arrangements. As a result, FXCM directed a substantial portion of its order flow to Effex, and Effex made monthly payments to FXCM equating to approximately $77 million from 2010 through 2014 alone, with payments continuing through at least 2016.

10. The CFTC ultimately concluded that in addition to the Company's violations of Regulation 5.16, FXCM also violated the Commodity Exchange Act and Commission Regulations by making misrepresentations to the Company's customers, benefiting from a "major conflict of interest that FXCM did not disclose to its clients," and by "ma[king] numerous false statements or representations to NFA concerning its relationship with [Effex]." As such, FXCM was ordered to pay a civil penalty of $7 million. FXCM was also outright banned from operating in the United States.

11. The Individual Defendants' wrongful actions have devastated FXCM. On November 10, 2017, the Company announced that FXCM entered into a restructuring support agreement pursuant to a plan of reorganization filed under Chapter 11 of the United States Bankruptcy Code. The following month, on December 29, 2017, the Company deregistered and withdrew its common stock from listing on the Nasdaq Capital Market, and shares of the Company's Class A Common

Stock are now traded OTC and valued at significantly less than $1 per share. Further, as a direct result of this unlawful course of conduct, the Company is now the subject of at least one federal securities class action filed in the U.S. District Court for the Southern District of New York on behalf of investors who purchased FXCM's shares.

12.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This also Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because: (i) FXCM maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to FXCM, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

16.     Plaintiff Ryan Spaulding was a stockholder of FXCM at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current FXCM stockholder.  Plaintiff is a citizen of Texas.

**Nominal Defendant**

17.     Nominal defendant FXCM is a Delaware corporation with principal executive offices located at 55 Water Street, 50th Floor, New York, New York.  Accordingly, FXCM is a citizen of Delaware and New York.  FXCM is a holding company whose only material asset is a controlling interest in Global Brokerage Holdings, LLC f/k/a FXCM Holdings, LLC ("Holdings"), the Company's predecessor, which owns 50.1% of FXCM Group, LLC.  Through FXCM Group, LLC, FXCM serves as an online provider of FX trading and related services.  FXCM changed its name to Global Brokerage, Inc. in February 2017.  As of December 31, 2016, FXCM serviced over 178,000 active retail accounts and had approximately 787 full-time employees and seventy-two full-time contractors.

**Defendants**

18.     Defendant Kenneth Grossman ("Grossman") is FXCM's Chief Executive Officer and has been since May 2017; a director and has been since at least September 2010; a Managing Director and has been since 1999; and one of the Company's founding partners.  Defendant Grossman was also Holdings' Chief Financial Officer from 1999 to 2007 and a Holdings director from 1999 to 2010.  Defendant Grossman is named as a defendant in a securities class action complaint that alleges he violated section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Defendant Grossman knowingly, recklessly, or with gross negligence caused or

- 8 -

allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest; and (iii) improperly implement the Rights Plan to entrench and benefit himself to the detriment of the Company. Defendant Grossman is a citizen of New York.

19.    Defendant David Sakhai ("Sakhai") is FXCM's Chief Operating Officer and has been since at least September 2010 and one of the Company's founding partners. Defendant Sakhai was also a director from at least September 2010 to February 2018. Defendant Sakhai was also Holdings' Chief Operating Officer and a director from 1999 to 2010. Defendant Sakhai is named as a defendant in a securities class action complaint that alleges he violated section 20(a) of the Exchange Act. Defendant Sakhai knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; and (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest. FXCM paid defendant Sakhai the following compensation as an executive:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|----------------------------------------|------------------------|-------|
| 2016 | $800,000 | $800,000 | $23,588 | $1,623,588 |
| 2015 | $800,000 | $1,280,000 | $22,548 | $2,102,548 |
| 2014 | $800,000 | - | $21,323 | $821,323 |
| 2013 | $800,000 | $660,446 | $21,110 | $1,481,556 |
| 2012 | $800,000 | - | $20,916 | $820,916 |
| 2011 | $800,000 | $196,000 | $21,284 | $1,017,284 |

| 2010 | $765,000 | - | $110,662 | $875,662 |

Defendant Sakhai is a citizen of New York.

20.     Defendant Eduard Yusupov ("Yusupov") is FXCM's Global Head of Dealing and a Managing Director and has been since at least September 2010 and one of the Company's founding partners. Defendant Yusupov was also a director from at least September 2010 to February 2018. Defendant Yusupov was also Holdings' Global Head of Dealing, a Managing Director, and a director from 1999 to 2010. Defendant Yusupov is named as a defendant in a securities class action complaint that alleges he violated section 20(a) of the Exchange Act. Defendant Yusupov knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; and (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest. FXCM paid defendant Yusupov the following compensation as an executive:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|----------------------------------------|------------------------|-------|
| 2016 | $800,000 | $800,000 | $9,265 | $1,609,265 |
| 2015 | $800,000 | $1,280,000 | $9,430 | $2,089,430 |
| 2014 | $800,000 | - | $8,781 | $808,781 |
| 2013 | $800,000 | $660,446 | $8,598 | $1,469,044 |
| 2012 | $800,000 | - | $8,596 | $808,596 |
| 2011 | $800,000 | $196,000 | $12,985 | $1,008,985 |

Defendant Yusupov is a citizen of New York.

21.     Defendant Arthur Gruen ("Gruen") is a FXCM director and has been since December 2010. Defendant Gruen was also the Chairman of FXCM's Audit Committee and a member of that committee from at least December 2010 to at least May 2017, and a member of the Corporate

Governance and Nominating Committee in at least April 2016. Defendant Gruen knowingly or recklessly caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest; and (iii) improperly implement the Rights Plan to entrench and benefit himself to the detriment of the Company. Defendant Gruen is a citizen of New York.

22.     Defendant Niv was FXCM's Interim Chief Executive Officer from February 2017 to May 2017; Chief Executive Officer, Chairman of the Board, and a director from at least September 2010 to February 2017; and one of the Company's founding partners. Defendant Niv was also Holdings' Chief Executive Officer and a director from 1999 to 2010. Defendant Niv is named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Niv knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest; and (iii) improperly implement the Rights Plan to entrench and benefit himself to the detriment of the Company. FXCM paid defendant Niv the following compensation as an executive:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|----------------------------------------|------------------------|-------|
| 2016 | $800,000 | $800,000 | $23,580 | $1,623,580 |
| 2015 | $800,000 | $1,280,000 | $22,548 | $2,102,548 |

| 2014 | $800,000 | - | $21,276 | $821,276 |
| 2013 | $800,000 | $660,446 | $21,147 | $1,481,593 |
| 2012 | $800,000 | - | $20,886 | $820,886 |
| 2011 | $800,000 | $196,000 | $21,061 | $1,017,061 |
| 2010 | $765,000 | - | $109,723 | $874,723 |

Defendant Niv is a citizen of Connecticut.

    23.    Defendant Ahdout was FXCM's Chief Dealer, a Managing Director, and a director from at least September 2010 to February 2017, and one of the Company's founding partners. Defendant Ahdout was also Holdings' Chief Dealer, Managing Director, and a director from 1999 to 2010. Defendant Ahdout is named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Ahdout knowingly or recklessly caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest; and (iii) improperly implement the Rights Plan to entrench and benefit himself to the detriment of the Company. FXCM paid defendant Ahdout the following compensation as an executive:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|----------------------------------------|------------------------|-------|
| 2016 | $800,000 | $800,000 | $23,680 | $1,623,680 |
| 2015 | $800,000 | $1,280,000 | $22,548 | $2,102,548 |
| 2014 | $800,000 | - | $21,875 | $821,875 |
| 2013 | $800,000 | $660,446 | $21,931 | $1,482,377 |
| 2012 | $800,000 | - | $21,930 | $821,930 |
| 2011 | $800,000 | $196,000 | $21,794 | $1,017,794 |
| 2010 | $765,000 | - | $21,794 | $786,794 |

Defendant Ahdout is a citizen of New York.

24.     Defendant Janelle G. Lester ("Lester") was FXCM's Chief Compliance Officer from September 2012 to August 2016. Defendant Lester is named as a defendant in a securities class action complaint that alleges she violated section 20(a) of the Exchange Act. Defendant Lester knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; and (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest. Defendant Lester is a citizen of Connecticut.

25.     Defendant Robert Lande ("Lande") was FXCM's Chief Financial Officer from January 2010 to February 2018. Defendant Lande is FXCM Group, LLC's President and has been since January 2018. Defendant Lande is named as a defendant in a securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Lande knowingly, recklessly, or with gross negligence caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; and (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest. FXCM paid defendant Lande the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $600,000 | - | - | - | $1,200,000 | $13,743 | $1,813,743 |
| 2015 | $600,000 | - | - | - | $960,000 | $12,147 | $1,572,147 |
| 2014 | $480,000 | $560,000 | $138,125 | - | - | - | $1,178,125 |
| 2013 | $480,000 | $475,000 | - | - | - | - | $955,000 |
| 2012 | $400,000 | $400,000 | - | $857,000 | - | - | $1,657,000 |
| 2011 | $400,000 | $400,000 | - | $532,500 | - | - | $1,332,500 |
| 2010 | $350,000 | $470,000 | - | $526,000 | - | - | $1,346,000 |

Defendant Lande is a citizen of New York.

26.     Defendant James G. Brown ("Brown") was FXCM's Presiding Independent Director from February 2011 to February 2017 and a director from December 2010 to July 2017. Defendant Brown was also a Holdings director from 2008 to 2010. Defendant Brown was a member of FXCM's Audit Committee and Corporate Governance and Nominating Committee from at least December 2010 to July 2017. Defendant Brown knowingly or recklessly caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest; and (iii) improperly implement the Rights Plan to entrench and benefit himself to the detriment of the Company. Defendant Brown is a citizen of New York.

27.     Defendant Eric LeGoff ("LeGoff") was a FXCM director from December 2010 to July 2017. Defendant LeGoff knowingly or recklessly caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; and (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No

Dealing Desk or agency model that was riskless and free from conflicts of interest. Defendant LeGoff is a citizen of New Jersey.

28.     Defendant Robin E. Davis ("Davis") was a FXCM director from December 2010 to at least December 2017. Defendant Davis was also a member of FXCM's Audit Committee from at least December 2010 to at least May 2017 and a member of the Corporate Governance and Nominating Committee in at least August 2017. Defendant Davis knowingly or recklessly caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest; and (iii) improperly implement the Rights Plan to entrench and benefit himself to the detriment of the Company. Defendant Davis is a citizen of New York.

29.     Defendant Ryan Silverman ("Silverman") was a FXCM director from December 2010 to at least December 2017. Defendant Silverman was also the Chairman of FXCM's Corporate Governance and Nominating Committee and a member of that committee from at least December 2010 to May 2017 and a member of the Audit Committee in at least August 2017. Defendant Silverman knowingly or recklessly caused or allowed the Company to: (i) continuously violate the unambiguous requirements of Regulation 5.16 for approximately five years by illegally guaranteeing against loss to FXCM's retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; (ii) wrongfully engage in conflicted transactions with related parties while utterly misrepresenting that FXCM operated a No Dealing Desk or agency model that was riskless and free from conflicts of interest; and (iii) improperly implement the Rights Plan to

entrench and benefit himself to the detriment of the Company.  Defendant Silverman is citizen of Florida.

30.     The defendants identified in ¶¶18-20, 22-25 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶18-23, 26-29 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶21, 26, 28-29 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶18-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe FXCM and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FXCM in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of FXCM and not in furtherance of their personal interest or benefit.

32.     To discharge their duties, the officers and directors of FXCM were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of FXCM were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)      remain informed as to how FXCM conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

33.      The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of FXCM, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

34.      The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to operate in violation of the law and grossly misrepresent its business operations to the investing public, engage in improper practices that wasted the Company's assets, and cause FXCM to incur substantial damage.

35.      The Individual Defendants, because of their positions of control and authority as officers and/or directors of FXCM, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, FXCM has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) cause or allow FXCM to blatantly violate the law; (ii) deceive the investing public, including stockholders of FXCM, regarding the Individual Defendants' management of FXCM's operations; and (iii) enhance the Individual Defendants' executive and directorial positions at FXCM and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

38.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

39.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

40.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of

the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## OVERVIEW OF THE FOREX MARKET AND FXCM'S BUSINESS

42.     FXCM offers customers access to OTC forex markets through the Company's trading platforms, which allow customers to buy and sell currencies on the Internet.  The Company went public in December 2010, and soon became one of the largest forex brokers for individual investors in the United States.

43.     The backbone of the forex market is comprised of "spot transactions," which are simply the exchange of one currency for another.  Currencies are typically traded through either the "Dealing Desk" model (also referred to as the "principal" model) or the "No Dealing Desk" model (also referred to as the "agency execution" model or simply, the "agency" model).  A Dealing Desk or principal forex broker, also known as a market maker, is a broker that takes the opposite side of a client's trades, by setting the bid and ask prices and waiting for a trader who would like to buy currencies at these set terms.  Dealing Desk brokers profit by buying at lower prices and selling at higher prices, and by taking advantage of the spreads between the bid and ask prices.  In most cases, Dealing Desk brokers keep trades within their own liquidity pools and do not require external liquidity providers such as banks or other financial institutions.  The Dealing Desk environment axiomatically involves significant conflicts of interest, given that for each trade, the Dealing Desk

brokers take the opposite position as their clients, profit through the spread, and earn the most when their clients lose the most.

44.     In contrast to Dealing Desk brokers, an agency or No Dealing Desk broker does not take the opposite side of their clients' trades.  Instead, they work as a middleman between traders to give their clients variable spreads and to match traders with other traders who would like to take the other side of a trade.  In other words, in an agency/No Dealing Desk environment, the client has the benefit of dealing with numerous liquidity providers in order to get the most competitive bid and ask prices.  Rather than profiting from customer losses, agency brokers primarily earn money through set trading fees and commissions.

45.     As detailed below, for years, the Individual Defendants misrepresented in the Company's marketing materials and SEC filings that FXCM operated an agency model, free from conflicts of interest with respect to its customers.  These representations were woefully misleading at best.  Separately, the Individual Defendants also caused or allowed FXCM to violate Regulation 5.16 for years by promising customers that the Company would not seek reimbursement for any negative customer balances resulting from trading activity.

### THE INDIVIDUAL DEFENDANTS CAUSE OR ALLOW FXCM TO BLATANTLY VIOLATE THE LAW FOR OVER HALF A DECADE

46.     Since at least 2010, FX traders such as FXCM have been prohibited by law from representing in any way that they will limit customer losses.  Specifically, Regulation 5.16 of the Dodd-Frank Act reforms explicitly states that:

(a) *No retail foreign exchange dealer*, futures commission merchant or introducing broker *may in any way represent that it will*, with respect to any retail foreign exchange transaction in any account carried by a retail foreign exchange dealer or futures commission merchant for or on behalf of any person:

(1) *Guarantee such person against loss*;

(2) *Limit the loss of such person*; or

> (3) Not call for or attempt to collect security deposits, margin, or other deposits as established for retail forex customers

47.     According to the CFTC, Regulation 5.16 was adopted for three primary reasons. First, Regulation 5.16 protects FX companies in the event of extreme volatility in the currency market. Second, Regulation 5.16 promotes the financial viability of FX companies, because such companies that guarantee against losses risk undercapitalization and potential bankruptcy. Third, the CFTC noted that policies guaranteeing or limiting customer losses are often involved in illegal conduct.

48.     Since the Company's 2010 initial public offering ("IPO"), *all* of FXCM's Forms 10-K, signed by each concurrently presiding Board member,[5] have explicitly recognized that FX traders such as FXCM are prohibited from representing that they will limit customer losses. The Company's Forms 10-K for 2010-2016 each specifically note that the CFTC released final rules relating to retail FX in August 2010, and further explained that:

> *[m]ost significantly the regulations… prohibit the making of guarantees against loss to retail FX customers* by FCMs, RFEDs and referring brokers and require that FCMs, RFEDs and referring brokers provide retail FX customers with enhanced written disclosure statements that, among other things, inform customers of the risk of loss.

49.     Despite the above noted unambiguous requirements of Regulation 5.16 which were repeatedly acknowledged by the Board, for years the Board caused or allowed FXCM to illegally make guarantees against losses to the Company's retail FX customers. Indeed, as noted by the CFTC in its August 18, 2016 complaint against FXCM, the Company's "policy of zeroing out negative customer balances was memorialized in FXCM's customer account opening documents, which had a provision stating that if the customer incurred a negative balance through trading activity FXCM would credit the customer account with the amount of the negative balance." Further, for years

---

[5] FXCM's Forms 10-K filed with the SEC on March 31, 2011, March 15, 2012, March 18, 2013, March 17, 2014, March 16, 2015, and March 11, 2016 were each signed by each presiding member of the Company's Board at the time of the filing, including Director Defendants Grossman, Sakhai, Yusupov, Davis, Gruen, Silverman, Niv, Ahdout, Brown, and LeGoff.

"FXCM had an advertised policy of zeroing out negative customer balances, effectively guaranteeing customers against loss in contravention of [CFTC] Regulations." For example, the Company's website long touted the following illegal guarantees:

> Although the margin call feature is designed to close positions when account equity falls below the margin requirements, there may be instances when liquidity does not exist at the exact margin call rate. As a result, account equity can fall below margin requirements at the time orders are filled, even to the point *where account equity becomes negative*. This is especially true during market gaps or volatile periods. [*FXCM will not hold traders responsible for deficit balances in this scenario*, but clients should be cognizant that all funds on deposit in an account are subject to loss.] FXCM [also] recommends that traders use Stop orders to limit downside risk in lieu of using a margin call as a final stop.

> \* \* \*

> **Is there a debit balance risk? Can I lose more money than I deposit?**

> *Not with FXCM. We guarantee you can never pay a debit balance. One of the greatest concerns traders have about leverage is that a sizable loss could result in owing money to their broker. At FXCM, your maximum risk of loss is limited by the amount in your account.* All accounts are tracked by our "Margin Watcher" feature. With the Margin Watcher feature, if account equity falls below margin requirements, the Active Trader Platform will trigger an order to close all open positions.

50.    The Company's illegal zero debt guarantees were also repeatedly disclosed in the Company's Annual Reports on Forms 10-K, signed by each of the Director Defendants.  In fact, although the Forms 10-K openly acknowledged for years that the Company was prohibited by law from in any way making guarantees against losses to its customers (as detailed above), these same Forms 10-K simultaneously boasted that FXCM's "*policy is generally not to pursue claims for negative equity against [its] customers*."  In particular, the Company's Forms 10-K for 2010 through 2015 stated:

> [FXCM's] technology platform includes a real time margin-watcher feature to ensure that open positions are automatically closed out if a customer becomes at risk of going into a negative balance on his or her account. Any disruption or corruption of this feature would subject us to the risk that amounts owed to us by such customer

exceed the collateral in such customer's account, and *our policy is generally not to pursue claims for negative equity against our customers*.

### THE INDIVIDUAL DEFENDANTS' DECISION TO CAUSE OR ALLOW FXCM TO VIOLATE THE LAW SIGNIFICANTLY HARMED FXCM WHILE ATTEMPTING TO ENRICH THE INDIVIDUAL DEFENDANTS

51.     The Director Defendants acted in bad faith by causing or allowing FXCM to continuously violate Regulation 5.16 for multiple years. This long-standing illegal conduct exposed the Company to significant risks, including the exact risks the CFTC sought to mitigate by enacting Regulation 5.16, and many of these risks in fact materialized following the January 2015 Flash Crash, when the value of the euro tumbled relative to the Swiss franc.

52.     As noted above, FXCM's business model provided for highly leveraged forex trading combined with an illegally touted policy of not pursuing claims for negative customer balances. Although this strategy increased FXCM's customer base and transactional profits in the short term, it almost destroyed the Company when market volatility caused one of the largest price swings of any G10[6] currency in recent history.

53.     On September 6, 2011, the SNB implemented a minimum exchange rate for the euro against the Swiss franc at 1:1.2. In other words, at a minimum, one euro would be worth 1.2 Swiss francs. If the euro appreciated relative to the Swiss franc, traders who took "long" positions betting on the euro to appreciate could make a profit by selling back the euros for Swiss francs. In part as a result of this cap, FXCM encouraged its customers to increase their EUR/CHF bets by taking long positions on the euro remaining strong against the Swiss franc. Thus, by early 2015, FXCM's

---

[6] The Group of Ten, or G10, consists of eleven industrialized nations that meet on an annual basis or more frequently, as necessary, to consult each other, debate, and cooperate on international financial matters. The member countries are: Belgium, Canada, France, Germany, Italy, Japan, the Netherlands, Sweden, Switzerland, the United Kingdom, and the United States.

customers had collectively accumulated over $1 billion on the EUR/CHF pair, with enormously one-sided long positions in favor of the euro.

54.     On January 15, 2015, Switzerland suddenly decoupled the euro from the Swiss franc, causing the Swiss franc to appreciate 18% compared to the euro over the course of the day.  The so-called SNB Event caused FXCM's highly leveraged customers with long euro positions in the EUR/CHF pair to suffer immediate and significant losses.   Although FXCM purportedly implemented systems that would automatically close out customers' balances when they became negative with off-setting trades, the currency pair moved too quickly and the necessary liquidity was not available.  As a result, FXCM's customers that were negatively affected by the SNB Event almost instantly generated over $276 million in negative customer balances.  Given FXCM's illegally touted policy of not collecting on negative balances, the Company was thus on the hook for these tremendous collective losses by its highly leveraged customers.

55.     The devastating financial blow of the SNB Event also caused FXCM to immediately breach certain regulatory capital requirements, leading regulators to threaten suspension of the Company's operations.  As a result, the Individual Defendants were forced to seek emergency funding which they secured from Leucadia on or about January 16, 2015, with subsequent amendments.  The Leucadia Loan included an interest rate of 10%, increasing 1.5% per quarter capped at a highly punitive 20.5%.  The parties also agreed that once the Leucadia Loan and associated fees were paid off, Leucadia would be entitled to 50% of the next $350 million of FXCM's sale proceeds, dividends, or distributions, 90% of the "[n]ext amount equal to 2 times the balance outstanding on the term loan and fees as of April 16, 2015, such amount not to be less than $500 million or more than $680 million," and 60% of "[a]ll aggregate amounts thereafter."  To make matters worse, the Leucadia Loan contained several restrictive covenants limiting FXCM's ability to

enter mergers and other significant transactions, yet provided Leucadia with the right to force a sale of the Company after three years.

56.     In the wake of the Company's shocking January 15 and 16 announcements, the New York Stock Exchange temporarily halted trading of FXCM's stock.  When trading resumed on January 20, 2015, the financial market's reaction was swift and severe: *FXCM's stock price plummeted nearly 90%* between January 14, 2015 and January 20, 2015, erasing nearly *$626 million* in market capitalization (tumbling from over $701 million to just $75.4 million) and effectively wiping out all stockholder equity in the Company.

57.     On January 30, 2015, less than two weeks after the Company lost nearly all its value, the Board[7] announced it had adopted the self-serving Rights Plan and declared a dividend distribution of one right on each outstanding share of the Company's Class A common stock.  The announcement claimed the Board was "committed to acting in the best interests of all its stockholders," and that the Rights Plan was "designed to reduce the likelihood that any person or group would gain control of the Company by open market accumulation or other coercive takeover tactics without paying a control premium for all shares."  In fact, however, the Rights Plan appears to have been designed to entrench the Company's Board and management by creating unreasonable barriers and wrongfully deterring any third party interest in the Company.  Indeed, the Rights Plan provided a meager 10% ownership trigger, and the Board amended the plan approximately one year later on January 26, 2016, to lower the ownership trigger even further to just 4.9%.  As a result, the Board and management successfully maintained their stranglehold on the Company and effectively

---

[7] At the time, the Board was comprised of Director Defendants Grossman, Gruen, Niv, Ahdout, Brown, LeGoff, Davis, Silverman, and nondefendant Perry G. Fish (deceased).

prevented any other FXCM stockholders from influencing corporate policy through proxy battles or otherwise opposing management.

58.     On March 10, 2016, FXCM announced that Leucadia and the Company entered into a memorandum of understanding to amend the terms of the credit agreement.  The memorandum of understanding, which was finalized in September 2016, extended the maturity date of the Loan to January 2018, provided Leucadia a 49.9% common membership interest in FXCM, and guaranteed that FXCM management, through FXCM Group, LLC, would receive between 10% and 14% any post-loan proceeds.

## THE INDIVIDUAL DEFENDANTS BLATANTLY MISREPRESENT FXCM'S BUSINESS MODEL TO ITS CUSTOMERS AND TO THE INVESTING PUBLIC

59.     In September through December 2010, FXCM filed various preliminary Registration Statements and Prospectuses with the SEC in connection with the Company's IPO, with its final Registration Documents filed on December 1, 2010 (the "Registration Documents").  The Registration Documents misrepresented that the Company utilized an "agency model," and acted as a mere "credit intermediary, or riskless principal" in transactions with its customers.  The Registration Documents further suggested that the Company's revenues were earned solely through trading fees and commissions, and not based on trading profits or losses.  In addition, the Registration Documents proclaimed that FXCM's purported agency model was "fundamental to [the Company's] core business philosophy because… it aligns [FXCM's] interests with those of [its] customers," removes potential conflicts, and "reduces [the Company's] risk," including with respect to market volatility  The Registration Documents stated:

> **Our business**
>
> We are an online provider of foreign exchange, or FX, trading and related services to approximately 175,000 retail and institutional customers globally. We offer our customers access to over-the-counter, or OTC, FX markets through our proprietary technology platform. In a FX trade, a participant buys one currency and

simultaneously sells another, a combination known as a "currency pair". Our platform presents our FX customers with the best price quotations on up to 56 currency pairs from up to 25 global banks, financial institutions and market makers, or FX market makers, which we believe provides our customers with an efficient and cost-effective way to trade FX. *We utilize what is referred to as agency execution or an agency model.* When our customer executes a trade on the best price quotation offered by our FX market makers, *we act as a credit intermediary, or riskless principal*, simultaneously entering into offsetting trades with both the customer and the FX market maker. *We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses*.

*Our agency model is fundamental to our core business philosophy* because we believe that it *aligns our interests with those of our customers, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers*. In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker. Principal model brokers' revenues typically consist primarily of trading gains or losses, and are more affected by market volatility than those of brokers utilizing the agency model.

60.     On March 31, 2011, the Company filed its first Annual Report on Form 10-K for the fiscal year ended December 31, 2010 with the SEC, signed by defendants Niv, Sakhai, Ahdout, Grossman, Yusupov, Lande, Brown, Silverman, and Gruen.  The very first page of the Form 10-K explained the Company's business and purported "agency" model using virtually identical language as noted above in the Registration Documents.  In the following years, the Individual Defendants continued to tout these same misrepresentations using substantially similar language on page one of each Form 10-K signed by all concurrently presiding Board members, including FXCM's Forms 10-K filed with the SEC on, March 15, 2012, March 18, 2013, March 17, 2014, March 16, 2015, and March 11, 2016.  During the same time, the Company also repeatedly misrepresented its purported No Dealing Desk model throughout FXCM's website and in various advertisements.

61.     The above representations were all grossly inaccurate.  Indeed, on February 6, 2017, the CFTC and NFA disclosed that they had settled various charges against FXCM and its two

founders, defendants Niv and Ahdout, and found that FXCM did not actually operate an agency model. Rather, these announcements revealed for the first time that FXCM had long been entwined in an undisclosed financial relationship with a market maker, Effex, that was backed by the Company and founded in 2010 by a former executive of the Company, John Dittami. According to the CFTC order, Effex "was an FXCM-backed startup firm that was founded by a former FXCM executive while he was working at FXCM, that operated for the first year of its existence out of FXCM's office, and that shared most of its trading profits with FXCM." In fact, as disclosed by the CFTC, defendants Niv and Ahdout, and others at FXCM, created the algorithmic trading system that was utilized by Effex to trade opposite the Company's customers.

62.     The CFTC further revealed that after the related party Effex was formed in 2010, FXCM maintained a 70% interest in all profits of Effex through publicly undisclosed contractual arrangements. More, FXCM improperly directed a substantial portion of its order flow to Effex, and Effex consistently "won" the largest share of FXCM's trading volume.  Through secretive agreements between FXCM and Effex, Effex made monthly payments to FXCM equating to approximately $77 million from 2010 through 2014 alone, with payments apparently continuing through at least 2016. During the same time, no market maker besides Effex paid FXCM for order flow. As a result of this scheme and unbeknown to investors, FXCM was essentially operating a Dealing Desk model for years, and was consistently and secretly taking positions that were adverse to its customers through these undisclosed related-party transactions with Effex.

63.     The CFTC ultimately concluded that FXCM violated the Commodity Exchange Act and CFTC Regulations by: (i) making numerous misrepresentations to the Company's customers; (ii) benefiting from a "major conflict of interest that FXCM did not disclose to its clients," and (iii) by "ma[king] numerous false statements or representations to NFA concerning [the Company's]

relationship with [Effex]," including false representations specifically by defendant Niv. As such, FXCM was ordered to pay a civil penalty of $7 million, and the Company was outright banned from operating in the United States.

64. On February 7, 2017, the day after the NFA and CFTC announced FXCM's illicit conduct and settlement, FXCM's stock price was slashed in half and the Company's already severely deflated market capitalization fell to just $19 million.

## THE COMPANY ANNOUNCES PENDING INTERNATIONAL REGULATORY INVESTIGATIONS, POTENTIAL DEFAULT ON THE LEUCADIA LOAN, AND FILES FOR CHAPTER 11 BANKRUPTCY

65. On March 20, 2017, FXCM filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 with the SEC. Unlike previous Forms 10-K, this Form 10-K no longer touted that the Company primarily offered a purported agency or No Dealing Desk model. The Form 10-K revealed for the first time that FXCM was under investigation outside of the United States, noting that "[t]here can be no guarantee our regulators in other parts of the world do not bring similar actions to those of the NFA and/or CFTC," and confirmed that "[t]he Company's subsidiaries are cooperating with regulatory authorities outside the U.S. in relation to their requests for information arising from the settlements announced on February 6, 2017." The Form 10-K also stated that the Company would be obligated to repay the aggregate principal amount of the Convertible Notes on the Leucadia Loan on June 15, 2018, but warned that FXCM "may not have enough available cash or be able to obtain financing at that time to meet [its] repayment obligations."

66. On November 10, 2017, FXCM announced that it had entered into a restructuring support agreement to restructure the obligations under the Convertible Notes pursuant to a prepackaged plan of reorganization (the "Plan") to be filed under Chapter 11 of the United States Bankruptcy Code. According to the Company, the purpose of the Plan is to exchange the 2.25% senior Convertible Notes due June 2018 for a new series of senior secured notes with a maturity date

that is five years after the effective date of the Plan. Among other things, the Plan also extends the credit agreement for another twelve months and provides that "[t]he rights of holders of the Corporation's Class A common stock will be unimpaired" by the Plan. On January 22, 2018, the United States Bankruptcy Court for the Southern District of New York issued an order approving the Plan, but only after adding a modification expressly stating that the Debtor Release section of the Plan "*shall not operate as a release of any claims of the [Company] against its current or former officers, directors and employees*."

## DAMAGES TO FXCM

67. As a result of the Individual Defendants' improprieties, for years FXCM misrepresented its fundamental business operations and operated in blatant violation of the law. These wrongful actions have devastated FXCM's credibility as reflected by the Company's approximate $750 million, or 99%, market capitalization loss from mid-2013 to the present.

68. FXCM's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, FXCM's current and potential customers consider a company's ability to accurately describe its business practices and operate within unambiguous legal confines. Businesses are less likely to award contracts to companies that misrepresent their operations or violate the law. FXCM's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

69.     Further, as a direct and proximate result of the Individual Defendants' actions, FXCM has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)     costs incurred from waiving negative customer balances; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to FXCM.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

70.     Plaintiff brings this action derivatively in the right and for the benefit of FXCM to redress injuries suffered, and to be suffered, by FXCM as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  FXCM is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

71.     Plaintiff will adequately and fairly represent the interests of FXCM in enforcing and prosecuting its rights.

72.     Plaintiff was a stockholder of FXCM at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current FXCM stockholder.

73.     The current Board of FXCM consists of the following three  individuals: defendants Grossman and Gruen, and nondefendant Bryan I. Reyhani.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused as to Defendants Grossman and Gruen Allowing the Company to Engage in Illegal and Improper Business Practices Is Not a Valid Exercise of Business Judgment**

74. For approximately half a decade, defendants Grossman and Gruen oversaw and instilled a culture of lawlessness at FXCM and repeatedly failed to stop the Company from violating Regulation 5.16. These defendants signed multiple Forms 10-K simultaneously acknowledging that: (i) FX companies are "prohibit[ed from] making of guarantees against loss to retail FX customers," and (ii) FXCM's "policy is generally not to pursue claims for negative equity against our customers." These defendants were also well aware of FXCM's long advertised policy not to pursue negative customer losses. Defendants Grossman's and Gruen's actions resulted in violations of the law, devastated the Company's reputation, and ultimately forced the Company to waive over $276 million in collective debts from its customers after the SNB Event. Defendants Grossman and Gruen participated or acquiesced in the misconduct and egregious circumstances complained of herein. The magnitude and duration of the Board's wrongdoing and failures show they are incapable of independently considering a demand. As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned business practices that were based on deliberate and widespread improper activities and violations of law. This pattern and practice of illegal conduct, spanning multiple years, can in no way be considered a valid exercise of business judgment. Accordingly, demand upon defendants Grossman and Gruen is excused.

**Demand Is Excused Because Defendants Grossman and Gruen Face a Substantial Likelihood of Liability for Their Misconduct**

75. The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations. Two of the three current Board members, defendants Grossman and Gruen, face a substantial likelihood of liability for repeatedly failing to comply with this duty. As alleged above, defendants Grossman and Gruen breached their fiduciary duties of loyalty and acted in bad faith by causing or allowing FXCM to violate the law for approximately five years. These defendants directly or tacitly approved a company-wide culture and scheme that

expressly touted the Company's illegal business practices.  The requirements of Regulation 5.16 are clear on its face, and defendants Grossman and Gruen repeatedly acknowledged such requirements while at the same time causing or allowing the Company to violate the law.  For years, these defendants also made improper statements in the Company's press releases, SEC filings, and advertisements, regarding the Company's purported No Dealing Desk model and lack of conflicts from FXCM's customers.  Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

76.     Plaintiff has not made a demand on the other stockholders of FXCM to institute this action since such a demand would be a futile and useless act for the following reasons:

(a)     FXCM is a publicly held company with over six million shares outstanding and thousands of stockholders;

(b)     making a demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making a demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78.     The Individual Defendants owed and owe FXCM fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe FXCM the highest obligation of good faith, fair dealing, loyalty, and due care.

79.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within FXCM, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

80.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Regulation 5.16 prohibits FX companies from in any way making guarantees against loss to retail FX customers; (ii) FXCM repeatedly made guarantees against loss to its retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; and (iii) contrary to years' long public representations by the Company, FXCM did not operate a No Dealing Desk or agency model that was riskless and free from conflicts of interest.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

81.     The Director Defendants, as directors of the Company, owed FXCM the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper and illegal activity concerning FXCM's business operations, and by improperly entrenching themselves by adopting the Rights Plan.  The Director Defendants knew or were reckless in not knowing that: (i) Regulation 5.16 prohibits FX companies from in any way making guarantees against loss to retail FX customers; (ii) FXCM repeatedly made guarantees against loss to its retail FX customers in customer contracts, marketing materials, and the Company's filings with the SEC; and (iii) contrary to years' long public representations by the Company, FXCM did not operate a No Dealing Desk or agency model that was riskless and free from conflicts of interest.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

82.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FXCM has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

83.     Plaintiff, on behalf of FXCM, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     As a result of the wrongdoing detailed herein and by failing to conduct proper supervision, the Individual Defendants have caused FXCM to waste its assets by illegally waiving the Company's right to collect on massive negative customer balances and by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

86.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

87.     Plaintiff, on behalf of FXCM, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of FXCM. The Individual Defendants were unjustly

enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to FXCM.

90.      Plaintiff, as a stockholder and representative of FXCM, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

91.      Plaintiff, on behalf of FXCM, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of FXCM, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing FXCM to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect FXCM and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen the Company's controls over legal and regulatory compliance;

2.      a proposal to strengthen the Company's controls over related-party transactions;

3.      a proposal to strengthen FXCM's oversight of its disclosure procedures;

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.      a provision to permit the stockholders of FXCM to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of FXCM has an effective remedy;

D.      Awarding to FXCM restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 19, 2018

LAW OFFICE OF THOMAS G. AMON

_____

THOMAS G. AMON

733 3rd Avenue, 15th Floor
New York, NY 10017
Telephone: (212) 810-2430
E-mail: tamon@amonlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SCOTT F. TEMPLETON
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
            csmith@robbinsarroyo.com
            stempleton@robbinsarryo.com

Attorneys for Plaintiff

1203515

## VERIFICATION

I, Ryan Spaulding, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 3/12/18

RYAN SPAULDING